[L. A. No. 4537. In Bank.—October 23, 1916.]

## ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

RAILROAD COMMISSION—COMPELLING RAILROAD COMPANY TO BUILD NEW LINE.—The railroad commission has no authority, under section 36 of the Public Utilities Act, to require a railroad company to extend its line of railroad, or to build a new line, so as to connect with its existing line points that have not theretofore been connected and which the company has not undertaken to so connect.

ID.—FORMER ABANDONED LINE BETWEEN TERMINI OF NEW LINE.—The fact that a railroad line, constructed but long since abandoned by a predecessor of the company, had once existed between the points ordered to be connected by the new line does not authorize the commission to make the connection.

ID.—COMMISSION DOES NOT ENFORCE PRIVATE CONTRACTS.—The railroad commission is not charged with the enforcement of private contracts.

CLXXIII Cal.—37

Its function is to regulate public utilities and to compel the enforcement of their duties to the public, not to compel them to carry out their contract obligations to individuals.

ID.—PUBLIC UTILITY—TAKING PROPERTY FOR PUBLIC USE—REQUIRING PROPERTY TO BE USED FOR NEW SERVICE.—A public utility, undertaking to supply a given public need, submits itself to the regulation and control of public authority with respect to the service which it has thus undertaken. But to require it to devote its property to a service which it has never professed to render is to take that property *pro tanto,* and such taking cannot be justified except under the power of eminent domain upon just compensation.

ID.—SUPPLY OF TRANSPORTATION NEEDS BY RAILROAD.—A railroad company, in constructing a line between given points, does not undertake to supply the transportation needs of any territory not reached by its lines.

ID.—EXTENSION OF RAILROAD LINES—POLICY TO BE DETERMINED BY DIRECTORS.—The question whether a railroad company shall extend its lines to points not theretofore reached by it, whether, in other words, it shall engage in a new and additional enterprise, is one of policy to be determined by its directors.

APPLICATION for a Writ of Certiorari to review an order of the Railroad Commission of the State of California.

The facts are stated in the opinion of the court.

E. W. Camp, U. T. Clotfelter, and Pillsbury, Madison & Sutro, for Petitioner.

Douglas Brookman, Allan Brant, and W. C. Wilde, *Amici Curiae,* for Respondents.

SLOSS, J.—This is a proceeding in *certiorari* to test the validity of an order of the railroad commission, requiring the Atchison, Topeka and Santa Fe Railway Company to construct and put into operation a line of railroad between Oceanside, in San Diego County, and Temecula, in Riverside County. The Atchison, Topeka and Santa Fe Railway Company (which we shall herein term the "Santa Fe company"), operates a transcontinental line of railroad, connecting with a number of lines in this state. It has succeeded to the property and railroad lines of the Southern California Railway Company, which was in turn the successor in interest of the California Southern Railroad Com-

pany. The last-named corporation was organized about the year 1880, to build and operate a railroad from the Bay of San Diego to a point of connection with the line of the Atlantic and Pacific Railroad, running easterly from Barstow, in San Bernardino County, and now forming a part of the main line of the Santa Fe system. The line of the California Southern Railroad Company was constructed from San Diego to Oceanside, thence northeasterly to Fallbrook Station, thence through the Temecula Canyon to Temecula, and thence northeasterly through Riverside and San Bernardino Counties to Barstow. The distance from Fallbrook Station to Temecula through the Temecula Canyon is about twelve miles. In the year 1891 this portion of the road was washed out by a flood, and it has never been rebuilt. Theretofore, in 1888, another line had been built connecting San Diego and Oceanside with San Bernardino via Santa Ana. This road, while longer than the one through the Temecula Canyon, could be operated to better advantage, because it avoided unfavorable grades and curves. It has also passed into the ownership and possession of the Santa Fe Company.

The proceeding now under review was instituted before the railroad commission by the complaint of various civic and commercial organizations in San Diego, joined by citizens of the vicinity, who sought an order requiring the Santa Fe Company to re-establish railroad operations between Fallbrook and Temecula in order to give direct service over this line to persons residing in the territory beyond Temecula. Prior to the construction of the original line, the California Southern Railroad Company had received donations of money and land, aggregating several millions of dollars in value, as an inducement to the construction of a railroad from the Bay of San Diego to a connection with the Atlantic and Pacific Railroad. An agreement to that end had been made between a representative of the intending donors and a group of men who undertook to form a corporation for the proposed construction. Pursuant to this agreement the California Southern Railroad Company was formed, and its line built.

The commission filed an elaborate opinion, in which it recited the foregoing facts and many others. It went carefully into the question of the cost of reconstructing the road through the Temecula Canyon, and made estimates of the

extent of territory which would furnish traffic in consequence of the proposed connection. Suggestion having been made that an alternative route could be constructed from Oceanside to Temecula without going through the Temecula Canyon, the commission also found the cost of constructing this line. The findings of the commission included the following:

"Eighth. That the re-establishment of a direct connection between San Diego and Temecula, either by way of the Temecula Canyon or by way of the so-called alternative line, both of which said lines are described in the preceding opinion, is a public necessity and will greatly benefit all of the country affected by this railroad.

"Ninth. That it is reasonable to order the defendant to make such connection, and that the present and prospective traffic justify the expenditure of the sum of money necessary to establish this connection."

On these findings an order was made requiring the Santa Fe company to present to the commission for its approval plans and estimates for a line connecting Oceanside and Temecula, either through the canyon or by the alternative route, and requiring it within twelve months after the approval by the commission of such plans and estimates to construct, complete, and put into operation such line of railroad and operate thereover regular passenger and freight service. This is the order which is attacked in the present proceeding.

The railroad commission seeks to find authority for its order in section 36 of the Public Utilities Act. So much of the section as is material here reads as follows:

"Sec. 36. Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that additions, extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property of any public utility or of any two or more public utilities ought reasonably to be made, or that a new structure or structures should be erected, to promote the security or convenience of its employees or the public, or in any other way to secure adequate service or facilities, the commission shall make and serve an order directing that such additions, extensions, repairs, improvements or changes be made or such structure or structures be

erected in the manner and within the time specified in said order.''

In assailing the validity of the order, the petitioner makes a number of contentions. These, generally speaking, divide themselves into two branches. One challenges the authority of the railroad commission to order the construction of a line of railroad, under the circumstances here shown, regardless of the consideration that the operation of the new line might, in a financial view, be beneficial to the company, while the other turns more specifically on the inquiry whether, under the evidence in this particular case, the construction directed to be made would be justified by the showing of probable earnings to accrue to the company. The first of these questions is the more fundamental, and in view of the conclusion we have reached on it we do not find it necessary to go into an analysis of the evidence that would have to be considered in passing on the second.

The issue to be determined is this: Has the railroad commission authority to require a railroad company to extend its line of railroad, or to build a new line, so as to connect with its existing line points that have not theretofore been connected and which the company has not undertaken to so connect? In thus stating the question, we eliminate from consideration the contract found to have been made between citizens of San Diego and the incorporators of the California Southern Railroad company, as well as the fact that a line had once been run from Fallbrook to Temecula.

While the commission, in its opinion, dwelt at some length upon the moral obligations arising from this contract, its conclusion was not, perhaps, in a legal sense, based upon it. The first finding of the learned commissioner who heard the testimony, after referring to the grants made under the contract, concludes as follows:

''I do not, however, find that the moral or legal obligations resulting from this contract are of necessity a deciding factor in this case.''

But whether or not the existence of the contract may, in some degree, have influenced the commission in reaching its conclusion, it is clear that grounds must be sought elsewhere for supporting the order here under review. We may pass, without expressing an opinion of its validity, the petitioner's suggestion that the Santa Fe company was not

a party to the contract, but was a purchaser under fore-closure of the properties of the corporation in whose be-half the agreement had been made, and therefore not bound by the contractual duties of its predecessor. (See *Hoard* v. *Chesapeake etc. Ry. Co.*, 123 U. S. 222, [31 L. Ed. 130, 8 Sup. Ct. Rep. 74].) For, even if it be granted that the burdens of the agreement rest on the petitioner, the railroad commission is not a body charged with the enforce-ment of private contracts. (See *Hanlon* v. *Eshleman*, 169 Cal. 200, [146 Pac. 656].) Its function, like that of the inter-state commerce commission, is to regulate public utilities and compel the enforcement of their duties to the public (*South-ern Pacific Co.* v. *Interstate Commerce Commission*, 219 U. S. 433, [55 L. Ed. 283, 31 Sup. Ct. Rep. 288]), not to compel them to carry out their contract obligations to individuals. This is conceded by the respondents themselves, and we need not, therefore, go into a review of the various provisions of the act (among others, section 36 itself), which demonstrate the soundness of the conclusion just stated.

Nor is the fact that a railroad line had once existed be-tween Fallbrook and Temecula a factor of any moment in the present inquiry. No question is made of the authority of the railroad commission to compel a railroad company or other public utility to restore a service which it has been furnishing. Here, however, the line between Fallbrook and Temecula had been destroyed for about twenty years before the action of the commission was invoked, and, in-deed, before the enactment of the law upon which the com-mission relies for its authority to act. It is expressly found that "that portion of the line was left abandoned and service discontinued. It has remained abandoned ever since." In view of this fact, it cannot be doubted that any obligation of the predecessor of the Santa Fe company to maintain and operate the line from Fallbrook to Temecula had long since ceased (*Public Service Com.* v. *Philadelphia etc. Ry. Co.*, 122 Md. 438, [87 Atl. 726],) and that no such obligation ever rested upon the Santa Fe company itself. The duty to maintain the line was dependent upon the right to maintain it, and this right was lost by abandon-ment (*Home Real Estate Co.* v. *Los Angeles Pac. Co.*, 163 Cal. 710, [126 Pac. 972]), without regard to the question whether it had been forfeited under the provisions of sec-

tion 468 of the Civil Code. The case must therefore stand precisely as it would if there had never been any connection between these two points.

The solution of the problem thus presented must be found in a definition of the character of the order complained of. Is the railroad commission, in ordering the construction of a railroad line, regulating the service which the petitioner has undertaken to give to the public, or is it compelling the railroad company to dedicate its property to a new service? If the former, the commission is acting within its jurisdiction; if the latter, it is attempting to exercise an authority which the statute either has not attempted or is unable to confer upon it. Section 36 of the Public Utilities Act authorizes the commission to make an order directing that "additions, extensions," etc., be made in the plant or facilities of any public utility. It might be argued that this language is broad enough to include additions to the plant, even though such additions may involve a service never contemplated nor undertaken by the owner of the utility. But if this be taken to be the true meaning, the section expresses an intent which cannot, under the restrictions of the federal constitution, be given effect. As was said by Henshaw, J., in *Pacific Tel. & Tel. Co.* v. *Eshleman*, 166 Cal. 640, 665, [Ann. Cas. 1915C, 882, 50 L. R. A. (N. S.) 652, 137 Pac. 1119, 1128], "It may not be amiss to point out that the devotion to a public use by a person or corporation of property held by them in ownership does not destroy their ownership and does not vest title to the property in the public so as to justify, under the exercise of police power, the taking away of the management and control of the property from its owners without compensation, upon the ground that public convenience would better be served thereby, or that the owners themselves have proven false or derelict in the performance of their public duty." And the following quotation from my opinion in the same case is also in point: "I think it cannot be doubted that an order, compelling the owner of private property, against his will, to subject that property to the use of the public or of an individual, amounts to a taking of property. . . . Where the particular property has been dedicated to a public use; where the property, in other words, is employed in a public service, the owner has consented that the public may use

his property within the limits to which the dedication extends. Within those limits, the use by the public does not constitute a taking, or, if it be a taking, it is one which has been invited by the owner. But the fact that the property has been offered for one public use does not authorize the public to use it for other and different purposes.''

Again, in *Del Mar Water etc. Co.* v. *Eshleman,* 167 Cal. 666, 680, [140 Pac. 591], Mr. Justice Shaw, in referring to section 36 and other provisions of the Public Utilities Act said: ''These sections, taken literally, seem to empower the commission to direct any public utility to extend its plant and enlarge the territory supplied by it in such manner as the commission shall judge advisable. But a proper interpretation of these provisions must be that they are limited in their application to such public service corporations as may have devoted their entire property to the use of the entire public, or to those which may have undertaken to supply a certain district, such as a city, and dedicated their property to that service and which afterward may have failed or refused to give to such district an adequate service or failed or refused to extend the system and supply to parts of the district when it was within its means to have done so and such extension would not be unreasonable. In such cases it would be entirely proper to give such a commission power to compel adequate service within the territory which the corporation had undertaken to serve and to compel any reasonable extension of the service to other parts of such territory. But even a constitutional declaration cannot transform a private enterprise, or a part thereof, into a public utility and thus take property for public use without condemnation and payment. The provisions of this act could not authorize the commission to compel such corporation to dedicate additional property to public use without additional compensation. When a corporation voluntarily devotes a part of its property to public use, it is to be presumed that it makes the dedication because it is satisfied with the return which it expects to receive, and in that way it is deemed to have been compensated for such dedication. But when it is forced to devote to public use additional property which it has not dedicated to public use, or is compelled to extend its service to supply uses or territory not embraced in the original dedication, it must, under our constitutional provisions, as a condition precedent, be compen-

sated for the value of the new property taken or new use exacted. This may be done under the power of eminent domain.''

The views thus announced, when applied to the facts of the case before us, lead inevitably to the conclusion that the commission exceeded its power in ordering the construction of a new line of road to connect Oceanside and Temecula. A public utility, undertaking to supply a given public need, submits itself to the regulation and control of public authority with respect to the service which it has thus undertaken. Thus, a water company having a franchise to supply water to the inhabitants of a given city assumes the public duty of supplying that community with water. It may be compelled to extend its mains in order to furnish the service to such inhabitants. (*Lukrawka* v. *Spring Valley Water Co.,* 169 Cal. 318, [Ann. Cas. 1916D, 277, 146 Pac. 640].) So of companies furnishing gas, electric current, or telephone service. (1 Wyman on Public Service Corporations, sec. 797.) But to require a public utility to devote its property to a service which it has never professed to render is to take that property, *pro tanto,* and such taking cannot be justified except under the power of eminent domain—i. e., upon just compensation. A railroad company, in constructing a line between given points, does not undertake to supply the transportation needs of any territory not reached by its lines. (1 Wyman on Public Service Corporations, sec. 272.) As is pointed out by petitioner, there is a very real difference between the nature of the service rendered by a railroad and that furnished by a water or gas company or a telephone system. Gas, water, electric light, or (as a rule) telephone service must, in the nature of things, be brought to the consumer. The obligation to supply a given district carries with it the duty, under reasonable limitations, to extend the mains or lines of the public utility to a point on the consumer's premises where use can be made of the service. Not so with a railroad company. Before freight or passengers can be transported they must be brought or must come to some point on the line of the railroad. True, the railroad company is bound to provide adequate facilities for the service of the public on its lines. It may be compelled to furnish proper stations for the reception and discharge of passengers and freight, to supply adequate motive power and cars, to install safety devices,

to make needed repairs and additions to its roadbed and track, and other like improvements. All of these matters fall within the scope of the regulation of the service which the company has undertaken to give. But there is a vital distinction between regulation of this character and a requirement that the railroad company shall extend its operations by building a new line of road to tap or supply a territory which has not theretofore had the benefit of direct railroad service. Such a requirement cannot be justified by saying that the points to be thus reached are within the area already served by the railroad. The area served by any railroad may, in a certain sense, be said to include all of the territory, in any direction, from which freight or passengers may be brought to the railroad by any other mode of conveyance. Such area may extend to a distance of many miles from the line of the road. Certainly the public duty of the company does not include the obligation of building lines to any or every portion of this indefinite expanse of territory.

Various decisions upholding orders of regulating bodies with respect to railroads are cited, but we think they do not, in any instance, meet the necessities of the case at bar. Much stress is laid upon *Wisconsin etc. Co.* v. *Jacobson*, 179 U. S. 287, [45 L. Ed. 194, 21 Sup. Ct. Rep. 115].) There the supreme court of the United States had under consideration an order of the railroad and warehouse commission of the state of Minnesota requiring two railroad companies whose tracks intersected at a certain point to provide connecting tracks, so that the cars of each company could be run on to the tracks of the other. The ground of the decision sustaining the order was, in effect, that the requirement was simply a regulation of the operations of the two companies in furtherance of their obligation to properly serve the public needs and convenience. There was no attempt to compel a road to extend its service beyond the lines which it was already operating. The companies were merely required to furnish facilities for the more adequate performance of a service already supplied. The same is true of the other cases upon which reliance is placed. Thus, in *Atlantic Coast Line* v. *North Carolina Corp. Com.*, 206 U. S. 1, [11 Ann. Cas. 398, 51 L. Ed. 933, 27 Sup. Ct. Rep. 585], the order in controversy directed a railroad to rearrange its schedules so as to make a convenient connection between its trains and those of another road passing a junc-

tion point. The order under review in *Missouri Pacific R. R.*
*Co.* v. *Kansas,* 216 U. S. 262, [54 L. Ed. 472, 30 Sup. Ct. Rep.
330], required the railroad company to put into operation on
one of its branches a passenger train in place of a mixed pas-
senger and freight train. This order, said the court, did
nothing more "than command the railroad company to per-
form a service which it was incumbent upon it to perform as
the necessary result of the possession and enjoyment of its
charter powers." So in *Minneapolis etc. R. R.* v. *Minnesota,*
193 U. S. 521, [48 L. Ed. 614, 24 Sup. Ct. Rep. 396], the
court sustained the validity of an order of the railroad and
warehouse commission of Minnesota directing the railroad
company to build and maintain a station-house at a certain
point on its line. This ruling, like the others mentioned, was
based upon the duty of the company to provide proper service
upon its lines, the court saying that "to establish stations
at proper places is the first duty of a railroad company. The
state can certainly provide for the enforcement of that duty."
The same grounds led to the decision in *Chicago, M. & St. P.*
*Ry. Co.* v. *Iowa,* 233 U. S. 334, [58 L. Ed. 988, 34 Sup. Ct.
Rep. 592]. The order there in question was one requiring
the railroad company to accept shipments of coal in carload
lots when tendered in cars of other railroad companies. The
requirement was justified "in order that reasonably adequate
facilities for traffic may be provided." And similar consid-
erations were made the ground of rulings upholding orders
requiring various railroads to use their tracks within the
city of Detroit for interchange of traffic (*Grand Trunk Ry.*
*Co.* v. *Michigan,* 231 U. S. 457, [58 L. Ed. 310, 34 Sup. Ct.
Rep. 152]), and directing a street railroad company to double
track its line for a distance of ten blocks. (*Phoenix Ry. Co.*
v. *Geary,* 239 U. S. 277, [60 L. Ed. 287, 36 Sup. Ct. Rep.
45].) In the case last cited the court, in its opinion, used
this expression: "Complainant is not required to open up new
territory but only to give better service upon a street already
occupied by it under a public franchise." These cases, one
and all, have to do with regulations designed to improve the
facilities for transacting the business already conducted upon
the lines built by the company and devoted to the transaction
of that business. They furnish no support for the claim that
a railroad company may be compelled to build new lines in

order to render a new service, however necessary or convenient such new service may be to the public.

"It must be remembered," said Mr. Justice Brewer in *Interstate Commerce Com.* v. *Chicago G. W. Ry. Co.*, 209 U. S. 108, 118, [52 L. Ed. 705, 28 Sup. Ct. Rep. 493], "that railroads are the private property of their owners; that while from the public character of the work in which they are engaged the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager." To the like effect are the following expressions from recent decisions of the supreme court of the United States: "A railroad's possessions are subject to its public duty, but beyond this and within charter limits, like other owners of private property, it may control its own affairs." (*Great Northern Ry.* v. *Minnesota*, 238 U. S. 340, [59 L. Ed. 1337, 35 Sup. Ct. Rep. 753].) "The company is entitled to the privilege of managing its business in its own way so long as it does not injuriously affect the health, comfort, safety, and convenience of the public." (*Chicago, M. & St. P. R. R. Co.* v. *Wisconsin*, 238 U. S. 491, [L. R. A. 1916A, 1133, 59 L. Ed. 1423, 35 Sup. Ct. Rep. 869]. See, also, *People* v. *Stevens*, 198 N. Y. 1, [19 Ann. Cas. 626, 27 L. R. A. (N. S.) 357, 90 N. E. 1140] ; *People* v. *Stevens*, 203 N. Y. 7, [96 N. E. 114] ; *Bacon* v. *Boston & Maine R. R.*, 83 Vt. 421, [76 Atl. 128].) These quotations point to the essential ground of the invalidity of the order here in question. The supervision of service rendered by a railroad company is a proper matter for public regulation and control. The question whether a railroad company shall extend its lines to points not theretofore reached by it, whether, in other words, it shall engage in a new and additional enterprise, is one of policy to be determined by its directors. To compel a railroad company to apply its property to the construction and operation of a line of railroad which it does not desire to construct or operate is to take its property.

As we have already indicated, we are cited to no authority which supports the power of the state, acting through its railroad commission, or otherwise, to compel the extension of a railroad line in the manner here attempted. On the contrary, such decisions as have come to our attention tend, rather, to deny the existence of any such power. In *Public*

*Service Commission* v. *Philadelphia etc. Ry. Co.*, 122 Md. 438, [89 Atl. 726], the court declared the invalidity of an order of the Maryland Public Service Commission requiring the railroad company to rebuild and operate a branch which had been abandoned (as had the line here in question) years before the making of the order and the acquisition of the line by its then owner. The Maryland statute authorized the commission to require a railroad company to make "repairs, improvements, changes . . . or additions" if in its judgment they "should reasonably be made"—a provision not unlike that found in section 36 of our Public Utilities Act. (See, also, *Towers* v. *United Rys. etc. Co.*, 126 Md. 478, [95 Atl. 170]; *Northern Pacific Ry. Co.* v. *Railroad Commission*, 58 Wash. 360, [28 L. R. A. (N. S.) 1021, 108 Pac. 938].)

The order is annulled.

Shaw, J., Melvin, J., Henshaw, J., Lawlor, J., and Angellotti, C. J., concurred.